[No. B176533. Second Dist., Div. Seven. Mar. 13, 2006.]

TIG INSURANCE COMPANY OF MICHIGAN, Plaintiff and Respondent, v.
HOMESTORE, INC., et al., Defendants and Appellants.

750

## COUNSEL

Covington & Burling, Donald W. Brown and Julian A. Biggs for Defendants and Appellants Homestore, Inc., Barbara Alexander, Michael A. Buckman, M. Jeffrey Charney, L. John Doerr, Joseph E. Hanauer, William E. Kelvie, Kenneth M. Klein, Terrence M. McDermott, Allan P. Merrill and Evelyn Yalung.

Morgan Lewis & Bockius, David M. Halbreich, Thomas M. Peterson and Jennifer L. Shoda for Defendant and Appellant Stuart H. Wolff.

Tucker Ellis & West, Kim W. West, Janice R. Hugener, Samantha M. Ball and Jully Yoon for Plaintiff and Respondent TIG Insurance Company of Michigan.

## OPINION

**PERLUSS, P. J.**—Homestore, Inc., and several of its officers and directors, Barbara Alexander, Michael A. Buckman, M. Jeffrey Charney, L. John Doerr, Joseph E. Hanauer, William E. Kelvie, Kenneth M. Klein, Terrence M. McDermott, Allan P. Merrill, Evelyn Yalung and Stuart H. Wolff (Appellant Insureds), appeal from the judgment entered after an order granting summary judgment for TIG Insurance Company of Michigan (TIG) in an action seeking rescission of Homestore's directors and officers (D&O) liability insurance policy. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Securities Claims and Criminal Investigation*

Homestore, a publicly traded company, is an Internet-based provider of residential real estate listings and related content. Homestore appeared to be performing well during fiscal year 2000 and the first quarter of 2001. However, in December 2001 Homestore announced the audit committee of its board of directors had begun an inquiry into the company's accounting methods and it would restate certain of its financial statements.[1]

Soon after Homestore's announcement shareholders began filing federal securities class action and derivative liability lawsuits against Homestore and many of its current and former officers and directors. The plaintiffs alleged, among other things, Homestore had materially overstated its revenues and its financial statements were materially inaccurate and misleading.

In September 2002 the United States Attorney for the Central District of California filed a criminal information alleging a scheme to commit securities fraud and naming Homestore's former chief financial officer, Joseph Shew, and two other former Homestore officers. Shew pleaded guilty to one count of conspiracy to commit securities fraud and admitted that from March through December 2001 he had conspired to overstate Homestore's advertising revenue and filed false form 10-Q's (quarterly financial reports) with the Securities and Exchange Commission.

---

[1] At the conclusion of the inquiry, for the three-month period ending March 31, 2001, Homestore reduced its previously reported revenue from $105.5 million to $63.8 million; increased its net loss from $67.1 million to $99.8 million; and increased its net loss per share from $0.71 to $1.05. It also reduced its previously reported revenue for the three-month period ending March 31, 2000 by $900,000, although there was no effect on its net loss or its net loss per share in that reporting period.

## 2. *The Insurance Policies*

On August 2, 2001 Shew signed a renewal application for a primary level D&O liability policy with Genesis Insurance Company for the policy year August 2001 through August 2002. As part of the underwriting process Genesis required Homestore to submit its most recent form 10-Q with the application. Homestore provided the form 10-Q it had filed for the quarter ended March 31, 2001.

Genesis issued a $10 million D&O policy, which included coverage for securities claims. Section VIII (General Conditions), paragraph C(1) of the policy states, "[T]he statements in the Application and in any materials submitted therewith are [the Directors', Officers' and the Company's] representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy, and that this Policy is issued in reliance upon the truth of such representations[.]" Paragraph C(2), the language at issue in this appeal, provides, "[I]n the event that the Application, including materials submitted therewith, contains misrepresentations made with the actual intent to deceive, or contain misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Insurer under this Policy, no coverage shall be afforded under this Policy . . . for any Director or Officer who did not sign the Application but who knew on the inception date of this Policy the facts that were so misrepresented, and this Policy in its entirety shall be void and of no effect whatsoever if such misrepresentations were known to be untrue on the inception date of the Policy by one or more of the individuals who signed the Application."

The Genesis application was also submitted on behalf of Homestore to TIG to obtain excess D&O coverage. TIG's underwriter reviewed Homestore's form 10-Q for the quarter ended March 31, 2001 as part of its own underwriting process. TIG issued a $5 million D&O policy, which provided excess coverage in conformity with the terms of the Genesis policy.

## 3. *The State and Federal Court Actions*

On February 21, 2003 TIG filed a complaint in Los Angeles County Superior Court for rescission, alleging it was entitled to rescind the D&O policy as to Homestore, the Appellant Insureds and other insured officers and directors who are not part of this action under state law and the policy's terms because Shew knew the form 10-Q for the quarter ended March 31, 2001, upon which TIG had relied in deciding to issue the policy, contained

material misrepresentations regarding Homestore's financial condition.[2] In May 2004 the trial court granted TIG's motion for summary judgment: "The Court finds that the application upon which the TIG Excess Policy was issued contains factual misrepresentations which were made with the actual intent to deceive and which were material to the acceptance of the risk and the hazard assumed by TIG, and the signatory of the application, Homestore's former Chief Financial Officer, Joseph Shew, knew such misrepresentations to be untrue at the time he signed the application and as of the inception date of the TIG Excess Policy. . . . Accordingly, under the plain meaning of the applicable provisions of the TIG Excess Policy, and pursuant to California law, the Court finds that TIG has the right to rescind the TIG Excess Policy in its entirety so that it shall be null, void and of no effect whatsoever as to all insureds."

Approximately 10 months earlier, in a similar action filed by Genesis in the United States District Court for the Central District of California to rescind the Genesis policy, the district court had granted Genesis's motion for summary judgment. The Ninth Circuit affirmed the district court's order in a consolidated appeal by Genesis and several other insurers who had also issued D&O policies to Homestore and its officers and directors. (*Federal Ins. Co. v. Homestore, Inc.* (9th Cir., Aug. 12, 2005, No. 03-55995) 2005 WL 1926483.)[3] The Ninth Circuit held the policy language was unambiguous and permitted Genesis to rescind as to all insureds based on Shew's knowing submission of the materially false form 10-Q in connection with the application. (*Id.* at p. *4.)

## CONTENTIONS

Homestore and the Appellant Insureds contend (1) section VIII, paragraph C(2) is ambiguous as to whether TIG may rescind the D&O policy as to the Appellant Insureds, who did not sign the application and were unaware

---

[2] Shew was a named defendant in the action filed by TIG; however, TIG voluntarily dismissed Shew pursuant to the terms of a stipulation of dismissal. The stipulation stated, "On August 2, 2001 Mr. Shew knew that the 1Q2001 Report contained material misrepresentations concerning Homestore's true financial condition."

[3] TIG contends the Ninth Circuit's decision should be given collateral estoppel effect to preclude Homestore and the Appellant Insureds from relitigating the issue of the proper interpretation of section VIII, paragraph C(2). In light of our conclusion the unambiguous policy language permitted TIG to rescind the D&O policy as to the Appellant Insureds, we need not address whether TIG may raise the issue of collateral estoppel on appeal when it failed to advance it as one of the grounds for summary judgment in the trial court. (See *Martin v. Martin* (1970) 2 Cal.3d 752, 761–762 [87 Cal.Rptr. 526, 470 P.2d 662] [question of finality of federal court judgment for res judicata or collateral estoppel purposes is governed by federal law; "federal rule is that a judgment or order, once rendered, is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition"]; *Calhoun v. Franchise Tax Bd.* (1978) 20 Cal.3d 881, 887 [143 Cal.Rptr. 692, 574 P.2d 763] [same].)

of the misrepresentations; and (2) triable issues of fact exist regarding whether section VIII, paragraph C(2)'s elements for rescission have been met.

## DISCUSSION

### 1. *Standard of Review*

We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296]; Code Civ. Proc., § 437c, subd. (c).)

Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.)' " (*Waller,* at p. 18.) "When interpreting a policy provision, we give its words their ordinary and popular sense except when they are used by the parties in a technical or other special sense." (*Haynes,* at p. 1204.) "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller,* at p. 18.) "[W]here the policy is clear and unequivocal, the only thing the insured may 'reasonably expect' is the coverage afforded by the plain language of the mutually agreed-upon terms." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2005) ¶ 4.9, p. 4-3; see *VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155 Cal.Rptr. 172] [insurance policy "must be construed from the language used and . . . where . . . its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties"].)

### 2. *California Law and the Unambiguous Policy Language Permit TIG to Rescind the Policy as to the Appellant Insureds*

Governing law permits an insurer to rescind a policy when the insured has misrepresented or concealed material information in connection

with obtaining insurance. (Ins. Code, §§ 331 ["Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."],[4] 359 ["If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false."], 361 ["The provisions of this chapter apply as well to a modification of a contract of insurance as to its original formation."].) Insurance Code section 650 provides any such rescission "shall apply to all insureds under the contract, including additional insureds, unless the contract provides otherwise."

■ The unambiguous language in section VIII, paragraph C(2) is consistent with TIG's statutory right to rescind the contract of insurance with respect to the Appellant Insureds notwithstanding the fact they did not sign the application and were apparently unaware of the false financial information included in the form 10-Q.[5] The policy provides that, if the application for insurance or information submitted with the application includes material misrepresentations and the person who signed the application—in this case Joseph Shew—knew of the misrepresentations, the policy is void in its entirety. To be sure, the policy also provides that, if the application or materials submitted with it include misrepresentations made with the actual intent to deceive or material to the risk assumed by TIG, coverage will be denied for any nonsigning director or officer who knew on the policy's inception date of the misrepresentations. This distinct right to rescind as to nonsigning individuals with actual knowledge of the application's false representations of fact, however, does not, under any reasonable interpretation of the policy language, restrict TIG's broader right (consistent with Ins. Code, § 650) to rescind the contract as to all insureds in the case of an application actually signed by an officer who had knowledge of the false statements. The clause simply does not provide that the policy will be void only as to the particular signer who had knowledge of the misrepresented facts.

---

[4] Concealment is defined as "[n]eglect to communicate that which a party knows, and ought to communicate." (Ins. Code, § 330.) Insurance Code section 332 provides, "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

[5] Homestore and the Appellant Insureds contend TIG did not argue statutory rescission in the trial court and any right to rescind must be predicated on the parties' contract, not statute. The complaint at paragraph 74, however, asserts rescission is based on the terms of the TIG policy, Civil Code section 1691, and Insurance Code sections 330, 331, 350, 351, 358, 359, and 650. The trial court also cited Insurance Code section 650 in its order granting summary judgment in favor of TIG. Moreover, whether it cited them or not, TIG never waived the governing sections of the Insurance Code when it agreed to section VIII, paragraph C. (Section VIII, paragraph G, "Conformity to Statute," expressly states, "Any terms of this Policy which are in conflict with the terms of any applicable laws construing this policy . . . are hereby amended to conform to such laws.") Consequently, the relevant inquiry is whether the terms of the policy limited the statutory grounds for rescission otherwise available to TIG.

Homestore and the Appellant Insureds dispute this conclusion, asserting section VIII, paragraph C(2) is reasonably subject to the interpretation that a misrepresentation known by one or more of the individuals who signed the application renders the policy voidable only as to the signers and not innocent nonsigners. That argument relies on a distorted dissection of the provision's grammar and sentence structure[6] and would render the distinction between signers and nonsigners essentially meaningless: Anyone who knew of a misrepresentation would not be covered; anyone who did not know would be covered. Homestore and the Appellant Insureds' strained interpretation would also require us to disregard the provision's clear admonition "this Policy in its entirety shall be void and of no effect whatsoever" if one or more of the individuals signing the application knew of the false statement. (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503 [30 Cal.Rptr.3d 787, 115 P.3d 68] [constructions of contractual provisions that would render other provisions surplusage are disfavored]; *Farmers Ins. Exchange v. Knopp* (1996) 50 Cal.App.4th 1415, 1421 [58 Cal.Rptr.2d 331] ["contracts, including insurance contracts, are to be construed to avoid rendering terms surplusage"].)[7]

Relying on *Watts v. Farmers Ins. Exchange* (2002) 98 Cal.App.4th 1246 [120 Cal.Rptr.2d 694], Homestore and the Appellant Insureds also assert policy language similar to the language at issue here—providing that "the entire policy shall be void"—was interpreted to permit rescission of an insurance policy only as to the insured who made a misrepresentation. In *Watts*, however, Division Four of this court was addressing whether the concealment and fraud clause in the standard form fire insurance policy, set forth in Insurance Code section 2071, barred recovery by an innocent co-insured when the other co-insured made a misrepresentation in connection

---

[6] Homestore and the Appellant Insureds assert the final portion of section VIII, paragraph C(2) applies only to individuals who signed the application because it uses the coordinate conjunction "and" to introduce the final clause, rather than using the disjunctive or adversative conjunction "but," and thereby signals the reader that what follows adds to, rather than detracts from, the preceding clause. According to Homestore and the Appellant Insureds, the penultimate clause assured innocent officers and directors their coverage would not be affected by misrepresentations made in connection with the application process. Homestore and the Appellant Insureds' premise is incorrect. The first clause advises nonsigning officers and directors with knowledge of misrepresentations they will not be covered. The second clause adds to that declination of coverage by providing no one will be covered if one of the officers or directors who actually signed the application had knowledge of the misrepresentation.

[7] At some point in their briefs Homestore and the Appellant Insureds appear to suggest yet another construction for the final portion of paragraph C(2): If a misrepresentation was known to one or more of the individuals who signed the application, the policy is voidable as to all signers, culpable or not, but again remains effective as to innocent nonsigners. While that interpretation, unlike their primary argument, would differentiate between signers and nonsigners, it too is predicated on a tortured reading of the actual language used and would require us to ignore the express mandate the policy "in its entirety shall be void" if a signer misrepresents a material fact.

with a claim.[8] Insurance Code section 2071 does not create a statutory right to apply rescission to all insureds in the event of a misrepresentation by any one of the individual insureds. Accordingly, the *Watts* court held, "[S]ince the language adopted by the Legislature for the standard form does not specifically state that the act of any insured will be attributed to all insureds, the intent is that coverage be severable and that an innocent co-insured be able to recover for his or her proportionate share of the damaged property." (98 Cal.App.4th at p. 1261.) In contrast to Insurance Code section 2071, Insurance Code section 650, which applies to D&O policies, specifically states, whenever a right to rescind a policy is authorized by that portion of the Insurance Code, including for concealment or misrepresentations in the application, the right to rescind applies to all insureds, thereby permitting attribution of culpable conduct unless the policy "provides otherwise." The question of contract interpretation in *Watts*, therefore, was quite different from the issue presented by the case at bar.[9]

Insurance Code section 650 also belies Homestore and the Appellant Insureds' public policy argument that permitting rescission as to the Appellant Insureds is contrary to their reasonable expectations and renders the securities

---

[8] The provision at issue in *Watts v. Farmers Ins. Exchange, supra*, 98 Cal.App.4th at pages 1260–1261, stated, " 'This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.' "

[9] Homestore and the Appellant Insureds contend indicia of severability in other provisions of the policy support the conclusion section VIII, paragraph C(2) is reasonably susceptible to the interpretation they urge. For example, the policy excludes claims involving illegal profit or advantage, dishonest or criminal acts or fraud on the part of directors or officers, but specifies in boldface, capital letters that "the actual or alleged conduct of any director, officer or the company shall not be imputed to any other director or officer for the purpose of determining the applicability of the above exclusions." While we agree with Homestore and the Appellant Insureds an insured would reasonably believe the coverage to be severable with respect to these exclusions, we disagree an insured could reasonably interpret paragraph C(2) in the same manner. To the contrary, that the policy explicitly and conspicuously states the crime-fraud exclusions are severable as to innocent officers and directors demonstrates TIG drafted policy language unambiguously limiting the imputation of wrongful conduct when that was intended by the parties. Accordingly, an insured would reasonably interpret the absence of such language in the provision voiding the policy if there was a knowing misrepresentation by the officer who signed the application to mean that any such wrongful conduct will in fact be imputed to the innocent officers and directors. Additionally, nothing in the extrinsic evidence or other policy indicia identified by Homestore and the Appellant Insureds concerning the parties' intentions supports the conclusion section VIII, paragraph C(2) is reasonably susceptible to the interpretation they urge. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554] [whether ambiguity exists in contract is question of law for court]; *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647 [3 Cal.Rptr.3d 228, 73 P.3d 1205] [intent in contract of insurance should be determined, to the extent possible, solely from the written provisions of the policy].)

coverage illusory. A contractual provision consistent with the Insurance Code cannot be contrary to public policy.

Indeed, the severability of D&O coverage has been litigated for more than 30 years;[10] and the need for companies and their officers and directors to ensure they obtain coverage with unambiguous severability provisions to protect against exactly what happened in this case has long been identified. "[S]uch [severability] provisions have become more common. Their effect is that misrepresentations or nondisclosures in the insurance application are *not* imputed from one officer or director to another." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7.1564, p. 7F-4; see *Shapiro v. American Home Assur. Co.* (D.C. Mass. 1984) 616 F.Supp. 900, 903 [policy here did not bar recovery by innocent co-insureds on basis of fraudulent acts in procurement of insurance because it had a "clear severability provision"].) Since Homestore (a company with $63.8 million in restated revenue for the quarter ended March 31, 2001) and the Appellant Insureds could have purchased a policy with a severability provision, their decision to purchase a policy without such a provision does not offend public policy.

### 3. *The Rescission Provision Is Not Subject to the Heightened Standard Applied to Exclusions and Termination Provisions*

As an alternative to their argument section VIII, paragraph C(2) is ambiguous regarding TIG's right to rescind the policy as to innocent nonsigning insureds, Homestore and the Appellant Insureds assert the provision is unenforceable because it was not "conspicuous, plain and clear," relying on cases dealing with provisions in the insurance contract that purport to exclude or limit coverage. In general, provisions relating to exclusions from coverage must be " 'conspicuous' "—"placed and printed so that [they] will attract the reader's attention"[11]—and " 'plain and clear' "—"stated precisely and understandably, in words that are part of the working vocabulary of the average

---

[10] "Most courts hold that material misrepresentations by *any* applicant justify the insurer's rescission of the policy as a whole. The insurer can thus avoid responsibility for losses claimed even by officers and directors who knew nothing of the misrepresentation. [Citations.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7.1563, p. 7F-4; see *National Union Fire Ins. v. Sahlen* (S.D.Fla. 1992) 807 F.Supp. 743, 747 ["While this result may seem unfair to those defendants who find themselves without coverage through no fault of their own, an equally unjust result would occur if the insurance company were required to supply coverage for a risk it never intended to insure."] affd. (11th Cir. 1993) 999 F.2d 1532; *Bird v. Penn Central Company* (1972) 341 F.Supp. 291, 294 ["While we sympathize with movant's position, and recognize that innocent officers and directors are likely to suffer if the entire policy is voidable because of one man's fraudulent response, it must be recognized that plaintiff insurers are likewise innocent parties."].)

[11] "Courts have invalidated exclusions as not conspicuous where not in a section labeled exclusions and placed on an overcrowded page [citations], or in a section labeled ' "General Limitations" ' but in a ' "dense pack" ' format [citation], or hidden in a subsequent section of the policy bearing no clear relationship to the insuring clause and concealed in fine print."

layperson." (*Haynes v. Farmers Ins. Exchange, supra*, 32 Cal.4th at 1204; see *Paramount Properties Co. v. Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562, 569 [83 Cal.Rptr. 394, 463 P.2d 746] ["Termination provisions which purport to curtail the insurer's liability in a manner inconsistent with the insured's reasonable expectations are closely analogous to exclusionary provisions . . . . In interpreting such termination provisions, we believe that the principles of construction for exclusionary provisions are applicable."].)

There is a significant distinction between the rescission provision at issue here and policy exclusions or the termination provision in *Paramount Properties Co. v. Transamerica Title Ins. Co., supra*, 1 Cal.3d at page 569. Most exclusions limit the scope of coverage an insured would reasonably expect; the requirement they be conspicuous and clear is intended to protect the insureds from unexpected and unreasonable denials of coverage. (See, e.g., *Haynes v. Farmers Ins. Exchange, supra*, 32 Cal.4th at p. 1206.) Section VIII, paragraph C(2), however, essentially confirms the provisions of Insurance Code section 650: An insurer may rescind a policy as to all insureds when material information has been misrepresented or concealed in the application process. As such, there is nothing about the provision that "takes away or limits coverage reasonably expected by the insured" and therefore nothing to trigger the requirements for a "conspicuous, plain and clear" statement. (See *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 868 [27 Cal.Rptr. 172, 377 P.2d 284]; *Haynes*, at p. 1204.)[12]

Section VIII, paragraph C(2) is sufficiently conspicuous as a term consistent with the Insurance Code to be enforceable. It is in the section titled "REPRESENTATIONS." That is exactly where one would expect to find the consequences for any misrepresentations made in connection with the insurance application to be enumerated. The section itself is short—two numbered

---

(*Cal-Farm Ins. Co. v. TAC Exterminators, Inc.* (1985) 172 Cal.App.3d 564, 577 [218 Cal.Rptr. 407]; accord, *Jauregui v. Mid-Century Ins. Co.* (1991) 1 Cal.App.4th 1544, 1549 [3 Cal.Rptr.2d 21] [language limiting permissive user liability was not conspicuous because it did not appear in either the "Exclusions" or "Limits on Liability" sections where insured was likely to look, but in "Other Insurance" section notwithstanding permissive user limitation had no relationship to insurance from other sources]; *Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 722–723 [193 Cal.Rptr. 632] [exclusion was not conspicuous when located under a misleading caption and on page containing more than 2,000 words, plus 17 numbers and 54 letters designating headings and subheadings divided into three columns]; cf. *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 385 [131 Cal.Rptr. 42, 551 P.2d 362] [exclusion was conspicuous when located in section of policy under boldface heading, "EXCLUSIONS," notwithstanding print was of same size and density as rest of policy].)

[12] To the extent section VIII, paragraph C(2) is inconsistent with the Insurance Code, it appears to provide officers and directors greater protection than the Insurance Code itself: Officers and directors retain coverage notwithstanding material misrepresentations or concealment in the application if they—and the person or persons who signed the application—were unaware of the misrepresentations or concealment.

paragraphs following an introductory paragraph and an introductory sentence—and each paragraph and the introductory sentence are set off by double spacing. It is in the same type, with spacing in the same manner, as the other general condition provisions in section VIII. It is not hidden in "dense pack" or on an overcrowded page—the hallmark of exclusions found not to be conspicuous.

Additionally, although the "plain and clear" standard for exclusions does not apply, section VIII, paragraph C(2) nonetheless satisfies this standard. Unlike the pollution exclusion in *MacKinnon v. Truck Ins. Exchange, supra*, 31 Cal.4th at p. 639 (policy-excluded injuries caused by the "discharge, dispersal, release or escape of pollutants"; "pollutants" was defined as " 'mean[ing] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and water materials' "), which Truck Insurance Exchange claimed precluded coverage for an action arising out of a bee extermination, or the medical insurance exclusion for "temporomandibular joint syndrome" at issue in *Ponder v. Blue Cross of Southern California, supra*, 145 Cal.App.3d at p. 724 (temporomandibular joint syndrome "is a technical medical term which has meaning primarily for health professionals"), there are no words in section VIII, paragraph C(2) that are not part of the working vocabulary of the average layperson or are not readily understandable in their ordinary and popular sense.

### 4. The Undisputed Evidence Demonstrates the Misrepresentations in the Form 10-Q Were Material to TIG's Acceptance of the Risk

It is undisputed Homestore's financial statements for the quarter ended March 31, 2001, which were reviewed by TIG's underwriter, overstated Homestore's revenue by $41.7 million and understated its loss by $32.7 million and its loss per share by $0.34. It is also undisputed section VIII, paragraph C(1) states, "[T]he statements in the Application and in any materials . . . shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy, and that this Policy is issued in reliance upon the truth of such representations."

Homestore and the Appellant Insureds contend, however, TIG was required to prove the misrepresentations in fact had a material effect on TIG's acceptance of the risk, not just that they were "deemed material," because, to rescind on the basis of misrepresentation, section VIII, paragraph C(2) requires that the misrepresentation "materially affect the acceptance of the

risk or the hazard assumed by the Insurer."[13] Homestore and the Appellant Insureds assert, if the parties had intended all misrepresentations would be considered material for rescission purposes pursuant to paragraph C(1), there would be no reason to refer in paragraph C(2) to anything more than misrepresentations in the application.

Although Homestore and the Appellant Insureds' argument may have merit as a matter of contract interpretation (see *Farmers Ins. Exchange v. Knopp, supra*, 50 Cal.App.4th at p. 1421), on this record Homestore's grossly misrepresented financial condition was material to the acceptance of the risk as a matter of law. (*Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 179 [243 Cal.Rptr. 639] [materiality can be determined as a matter of law if reasonable minds could not disagree]; *Cummings v. Farmers Ins. Exchange* (1988) 202 Cal.App.3d 1407, 1417 [249 Cal.Rptr. 568] [same].) The TIG underwriter for the Homestore D&O policy, William Morris, testified TIG relied on the financial information in the form 10-Q for the quarter ended March 31, 2001 in making the decision to issue the D&O policy and also testified he attended a client meeting in July 2001 where that financial information was discussed. Homestore and the Appellant Insureds' only rebuttal is a declaration from Donald Bendure, a former TIG product manager for nonstandard D&O insurance, who stated that for several enumerated reasons, "[m]ore accurate revenue figures for Homestore . . . may very well not have influenced TIG's decision to bind the account or have affected its calculation of the premium." The trial court, however, granted TIG's motion to strike Bendure's declaration, and Homestore and the Appellant Insureds do not argue the trial court erred in doing so. (See *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [120 Cal.Rptr.2d 281] [in light of appellant's failure to challenge trial court's ruling sustaining objections to certain evidence offered in opposition to summary judgment motion, any issue concerning correctness of trial court's evidentiary ruling has been waived].)[14] Consequently, we decline to consider this evidence; and the undisputed facts demonstrate the misrepresentations in the form 10-Q were material to the risk assumed by TIG. (See *Shapiro v. American Home Assur. Co.* (1984) 584 F.Supp. 1245, 1249 [financial statement that grossly overstated earnings and false statement in application that signer of application did not know of any act by company officials that might give rise to a claim deemed material as

[13] Statutory rescission also requires a showing the misrepresentation had a material effect on the insurer's acceptance of the risk. (Ins. Code, §§ 334 ["Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquires."], 360 ["The materiality of a representation is determined by the same rule as the materiality of a concealment."].)

[14] Homestore and the Appellant Insureds only assert the trial court "disregarded evidence" and that it granted the motion to strike Bendure's declaration without explanation or argument.

a matter of law; "facts misrepresented . . . were those that an insurer issuing a D&O policy is most likely to consider in making the underwriting decision"].)[15]

## DISPOSITION

The judgment is affirmed. TIG is to recover its costs on appeal.

Johnson, J., and Zelon, J., concurred.

---

[15] *We need not address whether the misrepresentations were made with the actual intent to deceive because a misrepresentation material to the risk assumed by TIG provided a sufficient basis for rescission pursuant to section VIII, paragraph C(2). (See generally* Cummings v. Fire Ins. Exchange, *supra,* 202 Cal.App.3d at p. 1418 ["the intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured wilfully makes it with knowledge of its falsity"].)