Filed 1/27/14  Springer v. GEICO General Ins. Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ROGER SPRINGER, | D063017 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00059449-CU-IC-NC) |
| GEICO GENERAL INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Affirmed.

Law Office of Carla DeDominicis and Spencer Guerena for Plaintiff and Appellant.

Konoske Akiyama & Brust, Gregory P. Konoske and D. Amy Akiyama for Defendants and Respondents.


Roger Springer was involved in an automobile collision with another driver who was at fault for the accident.  The other driver's insurer paid Springer in full for damages

to his vehicle and wrote the check jointly to Springer and his selected automobile repair shop. However, the automobile shop failed to repair Springer's vehicle and wrongfully kept the money. Springer then requested his own automobile insurer (Geico General Insurance Company (Geico)) to pay him for the unrepaired damages to his vehicle. Geico denied the claim on the basis that the policy did not cover losses for the automobile shop's wrongful conduct and/or that the policy excluded the claimed losses.

Springer then sued Geico and two related entities seeking a declaration of coverage. After a brief trial based primarily on stipulated facts, the court found Springer did not prove he was "entitled to coverage . . . under the terms of the subject policy of insurance." The court thus entered judgment in defendants' favor. Springer appeals. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2011, Geico issued an automobile insurance policy to Springer that provided various types of insurance, including collision and comprehensive coverage. The next month, Springer was involved in an automobile accident with Rasaura Laughlin. Laughlin ran a red light and was at fault for the accident. Laughlin was insured by State Farm Mutual Automobile Insurance Company (State Farm). Springer's vehicle, a 2008 Mustang, sustained property damage in the accident. Both Springer and Laughlin reported the accident to their insurers.

Springer did not request that Geico pay for the repairs (even though he knew he had the right to do so), and instead submitted a claim solely to State Farm. State Farm accepted liability, and offered to pay for the total cost of repairing Springer's Mustang.

2

As required under applicable law, State Farm allowed Springer to choose his own automobile repair shop, rather than use a State Farm recommended shop.  (Ins. Code, § 758.5.)  Springer selected Cafaro's Go Straight Auto Body (Cafaros) based on an acquaintance's recommendation and a personal meeting with owner Michael Cafaro.  Neither State Farm nor Geico was involved in the selection process.

On June 1, 2011, State Farm sent a letter to Springer advising him it had estimated the damages to his vehicle and it would leave the estimate and payment at Cafaros automobile repair shop.  The letter stated in part:

> "This payment is based on a repair estimate using prices that are competitive in your market area.  In the event additional damage is identified by the repairer you select, any amount previously paid will be taken into consideration as we determine any additional amounts owed.  We will review and consider any supplemental amounts requested by you or the repairer you select, should additional loss-related damage become apparent. . . ."

The letter also stated Springer should "review the damage estimate that has been prepared on your vehicle.  If now or later, you or your selected repairer discovers additional loss-related damage to your vehicle, please contact us at the number indicated below."

Five days later, State Farm delivered a $15,155.84 check to Cafaros.  The check was written jointly to "CAFARO'S GO STRAIGHT & ROGER SPRINGER."  Although Springer did not sign the check, Mr. Cafaro endorsed the check and deposited the check in his account the next day.  Before depositing the check, Mr. Cafaro "asked *and received*" Springer's "verbal authority to cash [the] check so repairs could commence." (Italics added.)

3

Cafaros began the repairs but never completed them despite repeated demands by Springer. The completed repairs had a value of $2,705.41. Cafaros has refused to return any of the funds for work that was not completed. The estimate of the additional necessary repairs is $12,450.43. Springer's unrepaired vehicle is now in "some lot in Oceanside" and is no longer in Cafaros's possession.

In September 2011, Springer's counsel made a written demand that Geico indemnify Springer for the losses to his vehicle. Springer sought coverage under the policy's collision coverage provisions based on facts showing his vehicle was damaged by a collision with another vehicle and his vehicle remains unrepaired. Springer also sought coverage under the policy's comprehensive coverage provisions based on facts that he suffered damages caused by "acts of theft committed by an auto body repair shop that is depriving [him] of possession of his vehicle . . . ." He stated that Cafaros has "*absconded with the money* State Farm paid for the repair of [his] vehicle, and left the Mustang to languish in disrepair." (Italics added.)

One month later, Geico sent Springer a written denial of his claim. Geico stated "[t]he 'loss' did not occur as a result of the accident [and instead] 'the loss' is a result of the breach of contract between Mr. Cafaro and Mr. Springer." Geico also identified Exclusion 14, which states "There is no coverage for any liability assumed under any contract or agreement." Geico stated: "Mr. Springer had a contract with [Cafaros] the body shop of Mr. Springer's choice. We are unable to [provide] coverage in regards to the dispute between Mr. Springer and Mr. Cafaro in regards to their contract on repairing Mr. Springer's vehicle."

4

The next month, Springer filed a superior court complaint for declaratory relief seeking an order that Geico and related entities are responsible for paying to repair his vehicle under the policy's collision coverage and/or comprehensive coverage.

The parties waived a jury and the case was tried primarily on stipulated facts (set forth above). Springer additionally testified to the following. He stated that he has reported Mr. Cafaro's conduct to police and regulatory agencies, but he has been unsuccessful in getting his car repaired or his money returned. He agreed that Cafaros stole his money and that Mr. Cafaro is a "crook." Springer said that when Mr. Cafaro attempted to deposit the check in his bank account, the bank called him to obtain his approval, and that he gave his verbal approval that the State Farm check could be deposited into Cafaro's account, but he had "no idea" of the check amount.

At trial, Springer's counsel asked him, "Because of the actions of Michael Cafaro, you have been denied the use of your vehicle; is that right?" Springer responded "Yes." Springer also said he understood that he could have initially sought coverage under his own policy, but he elected to instead seek coverage from Laughlin's insurer, State Farm.

At the conclusion of the evidence, both parties moved for nonsuit. The court stated that it would take the motions under submission and gave the parties the opportunity to argue the case in the event the nonsuit motions were denied.

Three days later, the court issued its written ruling in defendants' favor. The ruling stated: "The court, after trial lasting less than 90 minutes . . . considered the evidence in this case and denie[d] both parties' motions for 'nonsuit.' In addition, the court finds

5

plaintiff is not entitled to coverage in this instance under the terms of the subject policy of insurance."

DISCUSSION

I. *General Legal Principles*

"An insurance policy is written in two parts:  the insuring agreement defin[ing] the type of risks which are covered," and the exclusions that "remove coverage for certain risks which are initially within the insuring clause."  (*Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802-803.)  A court first " 'examine[s] the coverage provisions to determine whether a claim falls within the potential ambit of the insurance.' "  (*Id.* at p. 803.)  The burden is on "the insured to bring the claim within the basic scope of coverage, and . . . courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage."  (*Ibid.*)  "Once the insured has made that showing, the burden is on the insurer to prove the claim is specifically excluded." (*MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 777.)

" ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." ' "  (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204.)  "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation."  (*TIG Ins. Co. of Michigan v. Homestore, Inc.* (2006) 137 Cal.App.4th 749, 755.)  "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it."

6

(*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) The mutual intention of the parties governs the interpretation of the policy, which is "inferred, if possible, solely from the written provisions of the contract." (*Ibid.*) " 'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage," . . . controls judicial interpretation . . . .' " (*Ibid.*)

"Absent a factual dispute, the interpretation of an insurance contract and its application to undisputed facts are questions of law that we review de novo. [Citation.]" (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1391.)

## II. *Analysis*

Springer contends the court erred in determining his claimed losses were not covered under the collision and comprehensive coverage provisions of his Geico insurance policy and/or determining that an exclusion applied.

## A. *Collision Coverage*

Under the policy's collision coverage provisions, Geico agreed to "pay for **collision loss** to the **owned auto** or **non-owned auto** for the amount of each **loss** less the applicable deductible." " '**Loss**' " is defined to mean "direct and accidental loss or damage to: [¶] (a) an insured auto, including its equipment . . . ." A " '**Collision**' " means **loss** caused by upset of the covered auto or its collision with another object, including an attached vehicle." The term "upset" in this context generally means the vehicle overturned or lost "equilibrium" and "proceed[ed] beyond the power of those in charge to

7

stop it." (Lombardi, Cal. Automobile Insurance Law Guide (Cont.Ed.Bar 2d ed. 2012) § 7.12, p. 196.)

Springer submitted an insurance claim to Geico for the costs to complete the repairs on his vehicle, despite receiving full payment for the repairs from State Farm. As explained below, these costs did not result from a covered collision loss as these terms are defined in the policy.

The claimed damage (the vehicle's unrepaired condition) was not the result of a physical "collision" between vehicles or an "upset" of Springer's vehicle. State Farm fully compensated Springer for the damages caused by the collision, and Springer approved the bank depositing these funds in Cafaros's account for the repairs. The fact that Springer's vehicle remained unrepaired after receiving this full compensation resulted from Cafaros's alleged wrongful conduct, and not the collision. As Springer acknowledges, "Cafaro stole" his money, and it was "[b]ecause of the actions of Michael Cafaro, [that he has] been denied the use of [his] vehicle . . . ."

In the proceedings below, Springer's counsel argued that Springer's current damages (the loss of the funds provided to him by State Farm) were covered losses under Geico's collision coverage because the collision with State Farm's insured "set everything in motion" and "[i]f there hadn't been a collision, . . . [Springer's] car would be happily rolling down the streets . . . ." In his appellate brief, Springer similarly argues that he is entitled to coverage because the collision was the triggering cause of his current losses.

This argument is unsupported by the policy language and by California law regarding causation in the first party insurance context.

8

First, the Geico policy provides that " '***Loss***' means *direct* and accidental loss of or damages to" the insured's vehicle.  (Italics added.)  The trial court had a substantial basis to find the *direct* cause of Springer's current claimed loss was Cafaros's conduct and not the collision.

Additionally, Insurance Code section 530 states:  "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; *but he is not liable for a loss of which the peril insured against was only a remote cause.*"  (Italics added.)  This statute codifies the efficient proximate cause doctrine applicable to first party insurance, under which if there is more than one cause for a loss, coverage turns on whether the efficient proximate cause of the loss—the " 'predominat[ing] cause' "—is a covered peril.  (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 750 (*Julian*); see *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 401-404.)  "The efficient proximate cause of a loss is the 'predominant' or 'most important' cause of the loss." (*Freedman v. State Farm Ins. Co.* (2009) 173 Cal.App.4th 957, 961; *Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1409.)  "By focusing the causal inquiry on the most important cause of a loss, the efficient proximate cause doctrine creates a 'workable rule of coverage that provides a fair result within the reasonable expectations of both the insured and the insurer.' " (*Julian, supra*, 35 Cal.4th at p. 754.) If the asserted cause of the loss does not meet this test, it is a " 'remote cause' " and does not trigger coverage.  (*Id.* at p. 750.)  " 'Remote' causes are irrelevant in the causation

9

analysis." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013) ¶ 6:135.2, p. 6A-32.)

Here, although the collision may have set the events in motion, the collision was remote to the claimed damages and was not the efficient proximate cause of the loss. Once State Farm agreed to completely cover the loss and wrote the check *to Springer* for the estimated damages in full (with the promise to pay additional funds if needed to complete the repairs), *and* Springer accepted the funds and agreed to allow the repair shop to cash the check for his benefit, the accident was no longer the predominate or most important cause of the vehicle's unrepaired condition. Instead, this condition was the direct result of Cafaros's presumed breach of contract. The accident merely furnished the condition or occasion for Cafaros's breach and was unrelated to the primary cause of the damages.

Springer argues that his car would never have been at Cafaros's repair shop if there had been no accident and therefore the accident was a cause of the losses. This "but for" or "triggering" theory is insufficient to show coverage under California law. (See *Garvey v. State Farm Fire & Casualty Co., supra*, 48 Cal.3d at pp. 403-404; *Roberts v. Assurance Co. of America, supra*, 163 Cal.App.4th at p. 1409.)

Our conclusion that there is no coverage under the collision provisions of Geico's policy is further compelled by the policy's contractual subrogation clause.[1] Under the subrogation provision, Geico has the right to seek reimbursement from the wrongdoer and the insured must cooperate to allow Geico to enforce this right. However, a conclusion that Geico's policy requires it to make a duplicate payment for the automobile repair costs because of a third party's breach of contract would bar Geico from enforcing this subrogation right. Because State Farm already paid in full for the damages, Geico would not be entitled to obtain reimbursement from the at-fault driver or her insurer.

Relying on *Sapiano v. Williamsburg National Insurance Company* (1994) 28 Cal.App.4th 533, Springer argues this result is irrelevant because an insurer's subrogation rights are always dependent on the insured's right to be made whole. The argument is unavailing. Springer *was* made whole. Springer concedes State Farm paid his damages in full, and it was merely the conduct of a third party occurring *after he was made whole* that caused him to suffer continuing damages.

In this regard, *Sapiano* arose in a very different context. In *Sapiano*, the insured (Sapiano) had total property losses of at least $20,000. (*Sapiano, supra*, 28 Cal.App.4th at p. 535.) He received the maximum policy limit from his insurer ($14,500), and then

---

[1] The policy's subrogation clause states: "When payment is made under this policy, we will be subrogated to all the **insured's** rights of recovery against others. The **insured** will help us to enforce these rights. The **insured** will do nothing after loss to prejudice these rights. [¶] This means we will have the right to sue for or otherwise recover the loss from anyone else who may be held responsible."

11

sued the wrongdoer (without his insurer's involvement) and received $10,000 in a settlement for the property damage claim. (*Id.* at p. 536.) Sapiano's insurer then sought to recover the entire $10,000 settlement from Sapiano under the insurer's subrogation rights. (*Ibid.*) The appellate court held the insurer was not entitled to this recovery, relying on the general rule that until the creditor has been made whole for the loss, the subrogee may not enforce its claims based on its subrogation rights. (*Id.* at pp. 536-538.) The court emphasized that the insurer did not participate in the lawsuit and instead "sat back without assisting" its insured and then "demanded all the proceeds for itself." (*Id.* at p. 539.)

In this case, Springer received the funds from State Farm to fully repair his vehicle, and State Farm agreed to pay additional amounts if the damages were found to be more than the estimate. Thus, unlike the insured in *Sapiano*, Springer was provided full recovery for the damage to his car. In this situation, preserving Geico's contractual subrogation rights does not conflict with Springer's right to be made whole.

B. *Comprehensive Coverage*

Springer alternatively contends he was entitled to coverage under the comprehensive coverage provisions of Geico's insurance policy. The relevant provision of the policy states:

> "We will pay for each *loss,* less the applicable deductible, caused
> other than by *collision* to the *owned* or *non-owned auto.* This
> includes glass breakage and *loss* caused by:

12

(a) missiles;
(b) falling objects;
(c) fire;
(d) lightning;
(e) theft;
(f) larceny;
(g) explosion;
(h) earthquake;
(i) windstorm;
(j) hail;
(k) water;
(l) flood;
(m) malicious mischief;
(n) vandalism;
(o) riot;
(p) civil commotion; or
(q) colliding with a bird or animal."

Springer argues his losses were caused by the perils identified in (e) and (f) (theft and larceny) because Cafaros promised to repair Springer's vehicle and deposited the State Farm insurance money without any intention of fixing Springer's vehicle.

The argument is without merit. Springer's insurance policy covers "*loss* . . . to the *owned auto*" caused by theft or larceny, not the loss *of* funds related to the repair of the vehicle. Under its plain meaning, a "theft" or a "larceny" means the *wrongful* taking and carrying away of personal property with the intent to deprive the owner of this property permanently or for an extended period. (See *Barnett v. State Farm General Ins. Co.* (2011) 200 Cal.App.4th 536, 543-545; Pen. Code, § 484; Webster's 11th Collegiate Dict. (2006) pp. 701, 1295.) Springer did not proffer any evidence showing Cafaros obtained the vehicle wrongfully or without Springer's consent, or intended to deprive Springer of the property. To the contrary, the undisputed facts showed Springer voluntarily gave the vehicle to Cafaros for the repair, and the car is no longer in Cafaros's custody or control. Cafaros accepted money to perform a service that it failed to perform. The loss resulting from these actions did not arise from a third party's unlawfully taking or stealing the insured's vehicle. Rather, the loss arose out of Cafaros's failure to fulfill its contractual

13

obligation. The undisputed evidence shows the vehicle remains available to Springer (although not in a repaired state).

Springer does not cite to any relevant legal authority supporting that Cafaros's conduct constitutes "theft" or "larceny" of the vehicle as those terms are commonly understood in California. Instead, he relies only on *Riley v. Mid-Century Insurance Exchange* (1981) 118 Cal.App.3d 195, which is inapposite. In *Riley*, the insured had purchased a stolen vehicle, but she had purchased the car in good faith and had no reason to suspect it was stolen property. (*Id.* at p. 197.) Shortly after the insured's purchase, the vehicle was stolen from the insured's driveway. (*Ibid.*) The insured made a claim under her automobile insurance policy, and the insurer denied the claim. The insurer conceded the theft of the vehicle from the insured was a covered loss under the policy terms, but argued the insured had no insurable interest because the vehicle had been *previously* stolen. (*Ibid.*) The reviewing court rejected this argument, reasoning that an innocent purchaser for value has an interest in the vehicle against all but the lawful owner. (*Id.* at pp. 197-200.)

*Riley*'s holding is of no help to Springer. Although Springer had an insurable interest in his vehicle, unlike the incident in *Riley* where a car was taken from the insured's driveway without her knowledge or consent, Cafaros did not steal the vehicle from Springer or remove it from his possession through larceny. Although Cafaros may have improperly taken Springer's *money*, Springer did not show Cafaros's actions constituted a theft or larceny *of the vehicle*.

14

## C. *Contract Liability Exclusion*

Because the evidence compels the conclusion that the loss is not a covered loss under the comprehensive or collision policy provisions, we need not reach Geico's alternative arguments that coverage fell within the contractual liability exclusion (Exclusion No. 14). That exclusion provides: "There is no coverage for any liability assumed under any contract or agreement."

Springer argues Exclusion No. 14 is the sole basis upon which we can affirm the judgment because it is the only ground set forth in Geico's denial letter. This argument is not factually supported. The denial letter identifies Exclusion No. 14, but also referred to the policy definition of a " '*Loss*' " and stated there was no coverage because "[t]he 'loss' did not occur *as a result of* the accident." (Italics added.)

Further, the fact that an insurer does not identify a particular ground for denying a claim in a denial letter does not necessarily preclude the insurer from asserting the claim at trial. (*Waller, supra*, 11 Cal.4th at pp. 31-34.) Instead, waiver is a factual issue, and the party seeking to establish waiver must prove " 'by clear and convincing evidence' " the intentional relinquishment of a known right. (*Id.* at p. 31.) Likewise, an insurer is estopped from relying on a defense that was not included in the denial letter only if the insured proves it detrimentally relied on the insurer's failure to assert the defense. (*Id*. at pp. 32, 34.)

There was an ample basis for the court to conclude that Springer did not meet his burden to show waiver or estoppel. There are no facts showing Geico intended to relinquish its rights to assert the argument that the claimed losses did not come within the

insuring language of the policy.  Moreover, although Springer now says that he "*relied upon the singularity of that basis* [Exclusion 14] in pursuing this claim against Geico," he does not cite to any relevant evidence in the record supporting this assertion.

DISPOSITION

Judgment is affirmed.  Appellant to bear respondents' costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

16