[No. B215668. Second Dist., Div. Seven. Apr. 19, 2010.]

CAROLINA CASUALTY INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v.
L.M. ROSS LAW GROUP, LLP, Defendant, Cross-complainant and Appellant.

COUNSEL

Musick, Peeler & Garrett, David A. Tartaglio and Cheryl A. Orr for Defendant, Cross-complainant and Appellant.

Wootton Law Group and Chad B. Wootton for Plaintiff, Cross-defendant and Respondent.

OPINION

**PERLUSS, P. J.**—Carolina Casualty Insurance Company (Carolina Casualty) issued a legal malpractice policy to the L.M. Ross Law Group, LLP, a two-person law firm whose sole equity partner is Leonard M. Ross. Following the settlement of a legal malpractice action filed by Diversified Entertainment Co. (DEC) against Ross Law Group, Carolina Casualty sought to recover from Ross Law Group the $175,000 it had paid to settle the DEC action; and Ross Law Group cross-claimed to recover from Carolina Casualty the $75,000 it had contributed to the settlement. The trial court granted Carolina Casualty's motion for summary judgment and denied Ross Law Group's motion, finding several exclusions to coverage under the policy applied. Ross Law Group appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Insurance Policy*

Carolina Casualty issued a lawyers' professional liability policy to Ross Law Group for the policy period September 24, 2004 to September 24, 2005. The insuring agreement provided that Carolina Casualty would pay on behalf of the insured, defined as the named insured (Ross Law Group), as well as

any partner or employee of the named insured while acting within the scope of his or her duties on behalf of the named insured, all damages and claims expenses the insured became legally obligated to pay "arising from any **Claim** first made against an **Insured** during the **Policy Period** and reported to the **Insurer** in writing during the **Policy Period** or within 60 days thereafter, for any **Wrongful Act** . . . ." Although generally a claims-made policy, the policy expressly provided, if Ross Law Group became aware of a potential claim and provided written notice to Carolina Casualty of the facts and circumstances relating to it prior to the expiration or cancellation of the policy, "then any **Claim** subsequently made arising out of such fact, circumstance or situation shall be deemed to have been made when notice was first given to the **Insurer**."

Exclusion F provided Carolina Casualty would not be obligated to pay any damages or claims expenses in connection with a claim by any business enterprise other than Ross Law Group "in which the **Insured** owns more than a 10 percent interest, or in which any **Insured** is an owner, partner, or employee, or which is directly or indirectly controlled, operated, or managed by any **Insured** . . . ."[1]

### 2. *The DEC Lawsuit and Settlement*

On December 7, 2007 DEC filed a complaint for legal malpractice against Ross Law Group in Los Angeles Superior Court alleging the law firm had provided negligent advice to DEC in connection with an October 2004 agreement DEC made with Starlight Home Entertainment, Inc. (Starlight), to produce and distribute certain videotapes and DVD's featuring comedians Jeff Foxworthy and Bill Engvall. Specifically, the lawsuit alleged Ross Law Group improperly advised DEC it had the right to authorize Starlight to produce, market and distribute a program entitled "Live! From Las Vegas"; in June 2005 Starlight was enjoined in a Los Angeles Superior Court action from distributing the program; and Starlight thereafter sought to recoup the damages it had suffered as a result of the injunction by offsetting payments otherwise due from Starlight to DEC. DEC alleged it suffered damages in excess of $800,000 as a result of Ross Law Group's negligence.

---

[1] Exclusion E to the policy provided Carolina Casualty was not obligated to pay any damages or claims expenses in connection with a claim arising out of or in any way involving any insured's activities as an officer, director, partner, trustee or employee of a business enterprise other than Ross Law Group. Although the trial court granted summary judgment on the ground both exclusions E and F applied to the DEC claim, because we affirm the judgment under exclusion F, we need not address any legal or evidentiary issues raised in this appeal regarding exclusion E.

The DEC-Starlight dispute and DEC's potential legal malpractice claim were reported to Carolina Casualty by Ross Law Group on September 20, 2005, four days prior to the expiration of its legal malpractice policy. After the DEC lawsuit was filed in December 2007, Ross Law Group tendered the action to Carolina Casualty, which agreed to defend Ross Law Group under a reservation of rights. Because of Ross Law Group's notice to Carolina Casualty of DEC's potential malpractice claim, there is no dispute the claim was timely made and reported under the Carolina Casualty policy.

In June 2008, following a mediation, the legal malpractice action was settled by a total payment of $250,000 to DEC. Carolina Casualty contributed $175,000 to the settlement; Ross Law Group contributed $75,000. As part of their agreement Carolina Casualty and Ross Law Group each reserved its right to recover the amount it had paid from the other party; Ross Law Group waived its right to sue Carolina Casualty for bad faith or breach of the implied covenant of good faith and fair dealing; and Carolina Casualty waived any right it might have to recover the defense costs it had incurred in the DEC action.

### 3. *Carolina Casualty's Action for Declaratory Relief*

In May 2008, approximately one month before the settlement of the DEC action, Carolina Casualty filed this coverage action for declaratory relief and reimbursement in Los Angeles Superior Court. Carolina Casualty alleged DEC and its predecessor in interest, DMI Entertainment Co., LLC (DMI), were owned and managed or controlled by Leonard M. Ross, who also owned and managed Ross Law Group, and asserted no coverage was available for DEC's claim of legal malpractice against Ross Law Group "given the obvious potential for collusion in connection with such claims." Carolina Casualty sought a judicial declaration it had no duty to defend or indemnify Ross Law Group on the ground exclusions E and F precluded coverage under the policy. Although its initial complaint also sought reimbursement for all defense costs it had advanced, as discussed, Carolina Casualty agreed to waive those costs as part of the June 2008 settlement of the DEC action.

Following the DEC settlement and pursuant to its agreement regarding the scope of the remaining dispute between it and Carolina Casualty, Ross Law Group filed a cross-complaint in this action seeking only reimbursement of the $75,000 it had contributed toward the settlement. Ross Law Group and Carolina Casualty stipulated Carolina Casualty did not need to file an amended complaint specifically alleging its entitlement to reimbursement of

its $175,000 settlement payment; they agreed, if Carolina Casualty prevailed on its motion for summary judgment and established it had no duty to indemnify Ross Law Group in the DEC action, it would be entitled to a judgment in the amount of $175,000 (plus interest).

### 4. *The Summary Judgment Motions*

In December 2008 Carolina Casualty and Ross Law Group filed cross-motions for summary judgment and, in addition to the separate statements of undisputed material facts and other papers each party filed in support of its motion, jointly filed a stipulation of facts and authenticity of documents. Opposition and reply memoranda were filed. Carolina Casualty also filed objections to evidence submitted by Ross Law Group in support of its motion for summary judgment and a separate set of objections to evidence submitted by Ross Law Group in opposition to Carolina Casualty's motion for summary judgment.

### a. *Carolina Casualty's evidence of Ross's role in DEC and DMI*

In support of its argument exclusion F precluded coverage because of Leonard M. Ross's dual role in DEC and Ross Law Group, Carolina Casualty presented evidence the legal services by the Ross Law Group in connection with the October 2004 Starlight agreement had been provided to DMI, DEC's predecessor, because DMI did not change its name to DEC until late March 2005. In a May 10, 2005 declaration filed in support of Starlight's opposition to a preliminary injunction in the Foxworthy-Starlight state court action contesting Starlight's right to distribute "Live! From Las Vegas," Ross identified himself as the "chief executive officer" of DMI and its predecessor Rossco Entertainment Co. "during the period 2000 through the present." In addition, Ross had signed the October 2004 Starlight distribution agreement as an "authorized signatory" and "member" of DMI. He also signed the limited liability company certificate of amendment, dated March 29, 2005, changing the name of the company from DMI to DEC, as DEC's "manager." Ross signed a number of additional documents related to the dispute with Foxworthy and Starlight through 2006 as "manager" of DEC, including copyright applications for some of the content at issue in the lawsuits. (He also identified himself in the December 2005 copyright applications as an "authorized agent" of DEC.) Carolina Casualty also presented evidence the Leonard M. Ross Revocable Trust, of which Ross is both the settlor and trustee, has owned a majority interest in DMI/DEC at all relevant times.

### b. *Ross Law Group's evidence of Ross's limited role*

For its part Ross Law Group, through the declaration of Leonard M. Ross, asserted Ross's role in DEC and its predecessors changed throughout time

and insisted Ross was neither an owner nor a manager of the entity when the alleged legal malpractice was committed or when the malpractice claim was actually made in 2007. According to Ross's declaration, DEC is, in fact, the same business, through name changes, as Rossco Entertainment Co., LLC, which was formed in August 1999, and DMI, the entity's name as of June 27, 2001. Ross stated he never had any ownership interest in, nor was he ever a member of, DEC. Although Ross conceded he had signed the October 2004 distribution agreement, which was at the center of the legal malpractice claim, as a "member" of DEC, Ross claimed that was "incorrect because it was a mistake not to list me as signing as the Trustee of the [Leonard M.] Ross [Revocable] Trust."[2]

Ross acknowledged he was the manager of Rossco Entertainment Co. from its inception in mid-1999 through December 2000, but asserted at that point Diversified Management, Inc., a California corporation, became its manager. Ross stated Diversified Management, Inc., was DEC's manager "[f]or several years thereafter" and declared that neither Ross Law Group nor he had any interest in Diversified Management, Inc., and that he was never an officer or director of that entity. Ross admitted he was the manager of DEC "for a short period of time, but I withdrew from that position before [DEC] made its claim" against Ross Law Group. Ross also declared Diversified Management, Inc., not he, was the manager of DEC during the time Ross Law Group performed the professional services at issue in the DEC litigation with Starlight. Finally, Ross declared he did not participate in making DEC's decision to file the legal malpractice action against Ross Law Group. However, in his declaration filed with Ross Law Group's opposition to Carolina Casualty's motion for summary judgment, Ross agreed he was the manager of DEC "for a number of months from on or about April 2005."

    c.   *The trial court's decision granting Carolina Casualty's motion*

Following oral argument on January 23, 2009, the trial court sustained Carolina Casualty's evidentiary objections, granted Carolina Casualty's motion and denied Ross Law Group's motion, finding Leonard M. Ross had acted simultaneously as both the lawyer to DMI/DEC and its owner/manager: "Under the clear and unambiguous language of exclusion E and F in the Ross

---

[2] Ross stated in his declaration in opposition to Carolina Casualty's summary judgment motion that his May 10, 2005 declaration from the Foxworthy-Starlight litigation had been prepared by an attorney who had recently been hired by DEC and who was not totally familiar with all the facts. According to Ross, the declaration, which he signed under penalty of perjury, contained a number of inaccuracies. In particular, Ross averred he was never the chief executive officer of DMI; in fact, he declared, to his knowledge, DMI never had a chief executive officer.

firm's legal malpractice policy, there is no coverage for the claims asserted in the [DEC] action."

In its written ruling on the motions the trial court explained as to exclusion F, "The malpractice claim in the underlying [DEC] action arose from Ross's actions in connection with a business enterprise other than the Ross Law Group in which Ross was an owner of an interest larger than 10 percent and in which Ross indirectly or directly managed the entity." The court found, by Ross's own admissions,[3] he was involved in a myriad of activities as the "managing member" or "member" of DEC in 2005 and 2006, including on September 20, 2005 when the potential claim by DEC against Ross Law Group was reported to Carolina Casualty. The court further ruled the fact it is the Leonard M. Ross Revocable Trust, of which Ross is both the settlor and the trustee, rather than Ross personally, that owns an interest in DEC "is a technicality that is immaterial to the instant dispute. There is no distinction in California law between property owned by the revocable trust and property owned by the settlor of such a revocable trust during the lifetime of the settlor."

The court entered judgment in favor of Carolina Casualty on March 2, 2009. Ross Law Group filed a timely notice of appeal.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) We view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's. (*O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284 [30 Cal.Rptr.3d 507, 114 P.3d 753].)

---

[3] The court found the statements in Ross's declarations filed in this action attempting to limit the nature of his role in DMI and DEC, notwithstanding the self-descriptions contained in documents filed in other lawsuits, "fail to create a genuine factual dispute. Many of the statements in his declaration are inadmissible and objections asserted by [Carolina Casualty] have been sustained."

The interpretation of an insurance policy, like other contracts, is a legal question to which the court applies its own independent judgment. (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

### 2. *Ross Law Group's Evidentiary Issues*

Carolina Casualty filed a request for judicial notice in support of its motion for summary judgment that included Ross's May 10, 2005 declaration filed in the Foxworthy-Starlight state court action; Ross's February 27, 2006 declaration filed in a federal lawsuit between DEC and Starlight, which attached several letters and copyright applications as exhibits; and a March 1, 2006 certification and notice of interested parties filed in the same federal action identifying the Leonard M. Ross Revocable Trust as the majority owner in DEC. Carolina Casualty's separate statement of undisputed material facts identified Ross's descriptions in these documents of his various roles in DMI and DEC—chief executive officer, manager, member and authorized agent—during the relevant time period as evidence that exclusion F applied.[4] The court granted the request to take judicial notice of the documents submitted by Carolina Casualty and also ruled it would consider the truth of the matters asserted in the documents to the extent they were "admissible as prior testimony and/or party admissions."

Ross Law Group now argues taking judicial notice of the existence of the documents from the Foxworthy-Starlight and DEC-Starlight litigation proffered by Carolina Casualty was not error, but finding the hearsay statements contained in them admissible evidence was. Absent those statements, Ross Law Group contends, Carolina Casualty failed to establish a factual basis for applying exclusion F. In any event, Ross Law Group continues, the declarations of Leonard M. Ross submitted in this action denied he occupied an owner/manager/authorized agent role at DMI or DEC at the relevant times, thus creating triable issues of material fact. Because Ross explained why the documents submitted from the earlier lawsuits were inaccurate, Ross Law Group asserts it was error for the trial court to exclude under *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10] the statements in his declaration contesting the factual points raised by Carolina Casualty.

---

[4] As previously noted, Carolina Casualty also argued exclusion E applied to preclude coverage for the DEC claim because of Ross's various roles in the business enterprise.

Ross Law Group's challenges to the trial court's evidentiary rulings, even if properly preserved for appellate review,[5] are of no consequence. It is undisputed that Ross managed DEC when DEC's potential malpractice claim was reported by Ross Law Group to Carolina Casualty in September 2005[6] and that a majority interest in DEC has been held by the Leonard M. Ross Revocable Trust, of which Ross is both the settlor and trustee, at all relevant times.[7] Under the plain language of exclusion F of the professional liability policy, each of those facts precludes coverage and fully supports the trial court's decision to grant Carolina Casualty's motion for summary judgment.

3. *The Trial Court Properly Granted Carolina Casualty's Motion for Summary Judgment on the Ground Exclusion F Precluded Coverage of DEC's Claim*

a. *Ross managed DEC when the claim was made under the policy*

As discussed, exclusion F to Ross Law Group's lawyers' professional liability policy precludes coverage for any malpractice claim "by or in connection with any business enterprise [other than the Ross Law Group itself] . . . which is directly or indirectly controlled, operated, or managed" by Ross Law Group or one of its partners or employees (all within the definition

---

[5] Carolina Casualty clearly presented the judicial notice material to the court with its moving papers for the truth of Ross's descriptions, in sworn declarations, of his roles in DMI and DEC. Although Ross Law Group may be correct the hearsay statements in Ross's declarations do not fall within the exceptions contained in Evidence Code section 1220 for admissions of a party or Evidence Code section 1291 for former testimony because the declarant is neither a party to this coverage action nor unavailable as a witness, it forfeited any argument this evidence was inadmissible by failing to object in the trial court. (Code Civ. Proc., § 437c, subds. (b)(5), (d) [evidentiary objections not made at summary judgment hearing are waived]; see *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 452, fn. 3 [30 Cal.Rptr.3d 797, 115 P.3d 77] [in reviewing evidence before trial court on motion for summary judgment, "[d]efendant's failure to object to the deposition testimony bars any hearsay objection on appeal"]; *Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 281, fn. 2 [97 Cal.Rptr.3d 274, 211 P.3d 1063] [same].)

[6] Although the Ross Law Group did not expressly admit that Ross had been the manager of DEC in September 2005 when notice of the potential claim was given, neither it nor Ross himself disputed that fact. To the contrary, in his declaration in support of Ross Law Group's opposition to Carolina Casualty's motion for summary judgment, Ross acknowledged he had been the manager of DEC "for a number of months from on or about April 2005."

[7] Carolina Casualty's undisputed fact No. 36 stated, "The Leonard M. Ross Revocable Trust, of which Ross is both the settlor and trustee, owns a majority interest of DEC." Ross Law Group responded, "Undisputed but immaterial." At oral argument counsel for Ross Law Group also acknowledged that DEC was owned by the Leonard M. Ross Revocable Trust but argued "the trust is not an insured under the policy."

of an "insured"). Section VII of the policy, concerning notice of claims, provides in subsection B for a coverage tail: If the insured gives proper notice of a potential claim during the policy period, then any claim subsequently made based on those facts or circumstances "shall be deemed to have been made when notice was first given" to Carolina Casualty.

Because the DEC claim was made for purposes of coverage in September 2005 while Ross was manager of DEC, Carolina Casualty argues—and the trial court ruled—exclusion F applies in this case as a straightforward matter of contract interpretation. Emphasizing the use of the present tense "is" in exclusion F, Ross Law Group insists, notwithstanding section VII.B., that exclusion applies only to conditions existing when the actual claim is asserted, not when a potential claim was first reported.

■ Interpretation of an insurance policy follows the general rules of contract interpretation. (*Haynes v. Farmers Ins. Exchange, supra*, 32 Cal.4th at p. 1204; *Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpreta- tion. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.)' " (*Waller*, at p. 18.) "When interpreting a policy provision, we give[] its words their ordinary and popular sense except where they are used by the parties in a technical or other special sense." (*Haynes*, at p. 1204.) "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller*, at p. 18.) "[W]here the policy is clear and unequivocal, the only thing the insured may 'reasonably expect' is the coverage afforded by the plain language of the mutually agreed-upon terms." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 4:12, p. 4-3 (rev. # 1, 2009); see *VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155 Cal.Rptr. 172] [insurance policy "must be construed from the language used and . . . where . . . its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties"].)

■ We agree with the trial court the policy language is clear and unequivocal. By virtue of section VII.B., for purposes of coverage under this claims-made policy, the DEC claim was made on September 20, 2005 when

Ross, an insured, was managing the business. Nothing justifies interpreting the language in exclusion F insofar as it relates to an insured's status at the time a claim is made in a manner that is inconsistent with the coverage and notice provisions of the policy. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1271–1272 [10 Cal.Rptr.2d 538, 833 P.2d 545] [rejecting insured's argument that settlement payment represented damages, not disgorgement within the meaning of the Unfair Business Practices Act; "[t]he problem with this argument is that it contradicts the Bank's theory of coverage"].)

To be sure, exclusion F itself could have been drafted to expressly cover the specific situation here—an insured lawyer managed the business enterprise/client when his law firm notified the insurer of a potential malpractice claim but not when the actual malpractice action was filed. But the fact exclusion F could have been written differently does not necessarily mean, as Ross Law Group urges, it is ambiguous when read in the context of the policy as a whole, including section VII.B. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390–391 [33 Cal.Rptr.3d 562, 118 P.3d 589] [neither disagreement concerning the meaning of a phrase nor the fact a word or phrase isolated from its context is susceptible of more than one meaning makes a term in an insurance policy ambiguous]; *Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1070 [87 Cal.Rptr.3d 310] [language in an insurance policy "must be interpreted in the context of the policy as a whole, and in light of the circumstances of the case. It cannot be deemed to be ambiguous in the abstract."].) Reading the policy as a whole, we have no doubt an insured would reasonably expect exclusion F to apply in the circumstances presented by this case. (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761 [27 Cal.Rptr.3d 648, 110 P.3d 903] [policy exclusion should be interpreted and applied to facts of case to bring about " 'a fair result' within the reasonable expectations of both the insured and the insurer' "].)

Contrary to Ross Law Group's argument, it is not in any way inconsistent with the anticollusion purpose of exclusion F to interpret it, at least under the circumstances of this case, to apply when an insured lawyer controls, operates or manages the claimant at the time his or her law firm notifies the malpractice insurer of a potential claim in order to secure a coverage tail. On September 25, 2005 Ross Law Group, a law firm in which Ross was the sole equity partner, ensured (or attempted to ensure) it would have coverage against a malpractice claim that might be filed by DEC, a business entity managed by Ross. Leonard M. Ross was, in effect, the real party on both sides of the anticipated malpractice claim. At that point it was he who would assert any claim relating to the October 2004 distribution agreement on behalf of DEC, and it was he who would guide the Ross Law Group's response to any such claim. The potential for a collusive assertion of liability

here is readily apparent. That future events apparently led to a change in at least some of Ross's roles with respect to DEC does not alter Carolina Casualty's legitimate interest in protecting itself from such sham or collusive claims.

### b. *Ross owned a majority interest in the entity making the claim for purposes of exclusion F*

Exclusion F also precludes coverage for any malpractice claim by or in connection with any business enterprise other than the Ross Law Group itself in which the Ross Law Group or its partners or employees own more than a 10 percent interest. Although it is undisputed a majority interest in DEC has been owned by the Leonard M. Ross Revocable Trust at all relevant times, Ross Law Group argues the trust is not an insured and its ownership interest in DEC does not trigger exclusion F, notwithstanding the fact Ross is both the settlor and trustee.

■ As the trial court correctly observed, at least for most purposes "[t]here is no distinction in California law between property owned by the revocable trust and property owned by the settlor of such a revocable trust during the lifetime of the settlor." "Under California law, a revocable inter vivos trust is recognized as simply 'a probate avoidance device . . . .' . . . Property transferred to, or held in, a revocable inter vivos trust is nonetheless deemed the property of the settlor . . . ." (*Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 633 [82 Cal.Rptr.3d 835]; see also Prob. Code, § 18200 [property in revocable trust subject to claims of settlor's creditors "to the extent of the power of revocation during the lifetime of the settlor"]; Rev. & Tax. Code, § 62, subd. (d) [transfer by settlor to revocable trust is not a change in ownership].)

"[A] settlor with the power to revoke a living trust effectively retains full ownership and control over any property transferred to that trust . . . ." (*Arluk Medical Center Industrial Group, Inc. v. Dobler* (2004) 116 Cal.App.4th 1324, 1331–1332 [11 Cal.Rptr.3d 194]; see *Fisch, Spiegler, Ginsburg & Ladner v. Appel* (1992) 10 Cal.App.4th 1810, 1813 [13 Cal.Rptr.2d 471] [homestead exemption valid even though title to couple's home held in their revocable living trust; living trust is simply an "estate planning device"].) The potential for a collusive assertion of liability when the claimant is owned by the insured lawyer's revocable trust is no less than when the lawyer owns the claimant directly. The trial court properly granted summary judgment on the ground exclusion F also applies because an insured (Ross) owned more than a 10 percent interest in DEC, the entity that had made the malpractice claim against Ross Law Group.

## DISPOSITION

The judgment is affirmed. Carolina Casualty is to recover its costs on appeal.

Woods, J., and Jackson, J., concurred.