Filed 8/25/14  Modified and Certified for Pub. 9/15/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JON DAVLER, INC., | B252830 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC517442 ) |
| v. | |
| ARCH INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle Rosenblatt, Judge.  Affirmed.

Ideal Legal Group, Inc. and Jie Lian for Plaintiff and Appellant.

Musick, Peeler & Garrett LLP and Cheryl A. Orr for Defendant and Respondent.

_____

# INTRODUCTION

A group of employees brought an action against their employer, Jon Davler, Inc., for various employment claims, including sexual harassment, invasion of privacy, and false imprisonment. Jon Davler tendered the action to its insurer, Arch Insurance Company, which denied coverage based on an employment-related practices exclusion. After Jon Davler filed this insurance coverage action against Arch, the trial court sustained Arch's demurrer to the complaint without leave to amend. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

## A.    *The Underlying Action*

Three female employees of Jon Davler, a cosmetics company, sued their employer, individually and on behalf of all similarly situated employees, for sexual harassment in violation of Government Code section 12940, subdivision (j), failure to prevent sexual harassment in violation of Government Code section 12940, subdivisions (j) and (k), invasion of privacy in violation of article I, section 1 of the California Constitution, intentional infliction of emotional distress, and false imprisonment. The employees also named as a defendant Christina Yang, an owner, manager, or supervisor of Jon Davler.

The employees alleged that Yang became upset one morning "because she found a used sanitary napkin around the toilet area in the women's bathroom and blood around the toilet seat" at the Jon Davler facility where they worked. The employees alleged that Yang was so upset that she went to the department where they were working "and started yelling that they were 'dirty' and demanded to know who was on their menstrual period so that she could determine who had left the used sanitary napkin by the toilet and the toilet unclean." Yang demanded in a loud, angry voice, "'Are you on your period!'" The employees denied that they were on their menstrual cycle, but Yang "was not satisfied with the responses she received." She instructed another female employee, against her

2

will, "to take each of [the employees] into the bathroom, one by one, and check their panties to see who was on their menstrual period, by requiring each to pull down their pants and underwear for an inspection."

The employees were "shocked and in a state of disbelief" at Yang's instructions. When they asked about the consequences of refusing to participate in the inspection, Yang said that anyone who refused would be fired. Yang then lined up the employees outside the bathroom. While a male supervisor waited with Yang outside the bathroom door, the designated female employee went into the bathroom with each employee, "stood a foot or two away" while the employees "had to pull down their pants and their panties, exposing their vaginal area, so that [the employee] could see if they were wearing a sanitary napkin and therefore on their period." When the employees exited the bathroom after the inspection, they "found it extremely difficult and embarrassing to face Yang" and the male supervisor, "and quickly went back to their work area while the inspections continued with the other" employees. In their cause of action for false imprisonment, the employees alleged that they "were wrongfully detained and confined by [Jon Davler and Yang] in the bathroom for the purpose of conducting a humiliating and wrongful inspection of their vaginal area to determine if they were on their menstrual period."

B.    *The Policy*

Arch issued Jon Davler a commercial general liability policy that, among other coverage, provided coverage for "those sums [Jon Davler] becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies."[1] The policy defined "personal and advertising injury" as "injury, including consequential 'bodily injury,' arising out of" seven categories of offenses, one of which was "[f]alse arrest, detention or imprisonment. . . ."

---

[1]    The policy provided similar coverage for "'bodily injury' or 'property damage,'" but this coverage is not at issue in this case.

3

The policy contained an "Employment-Related Practices Exclusion," which the parties refer to as an ERP exclusion. This exclusion stated that the coverage for personal and advertising injury did not apply to an injury arising out of any refusal to employ a person, termination of a person's employment, or "[e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person . . . ."

Jon Davler tendered the underlying action to Arch. Arch declined coverage and refused to provide indemnity or a defense based on the employment-related practices exclusion.


C.     *This Action*

Jon Davler filed this action against Arch for breach of contract, breach of the covenant of good faith and fair dealing, and conversion. Jon Davler alleged that the personal and advertising injuring coverage included indemnity and defense for "false arrest, detention and imprisonment" and "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." Jon Davler alleged that Arch's refusal to provide indemnity or a defense breached the terms of the policy and "was unreasonable and in bad faith." Jon Davler also alleged that Arch "converted [its] Policy benefits and premium payments . . . ."

Arch demurred, arguing that all of the claims in the underlying action alleged "injury to persons 'arising out of' '[e]mployment-related practices, policies, acts or omissions,'" and that therefore the employment-related practices exclusion applied. Arch emphasized that the only relationship between the employees in the underlying action and Arch's insured Jon Davler was an employment relationship, that the employees alleged Yang had told the employees they would be fired if they did not comply with the inspection demand, and that all of the claims were based on allegations of harassment and hostile work environment. Arch also noted that, "[i]n obvious recognition that their claims were based upon employment practices," the employees alleged that they had

4

"exhausted their administrative remedies by filing a complaint with the California Department of Fair Employment and Housing . . . ." In opposition, Jon Davler argued that the employment-related practices exclusion was ambiguous and did not apply to a claim based on false imprisonment that "occurred in an employment scenario and was for employment purposes."

The trial court sustained Arch's demurrer without leave to amend. The court noted that because all of the causes of action other than false imprisonment were "clearly the types of actions" covered by the employment-related practices exclusion, it was "really the false imprisonment that we are concentrating on here, and [Jon Davler] is alleging ambiguity as applied in this situation." The court ruled that all of the claims in the underlying action "fall within [the] exclusion, and, therefore, the demurrer is sustained without leave to amend." The trial court entered an order of dismissal. Jon Davler appealed.

## DISCUSSION

A. *Standard of Review and the Duty of an Insurer*

"'Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether . . . the . . . complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether . . . the trial court erroneously sustained the demurrer as a matter of law. [Citation.]' [Citation.] 'Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether . . . the plaintiff could amend the complaint to state a cause of action. [Citation.]' [Citation.]" (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 734.) Where an insured has asserted a claim against an insurer for breach of the duty to defend, and the policy and the underlying third party complaint has been incorporated into the insured's complaint against the insurer, "we may properly rely on these

documents in assessing whether [the insured's] claims are legally tenable." (*Total Call Intern., Inc. v. Peerless Ins. Co.* (2010) 181 Cal.App.4th 161, 166.)

"An insurer must defend its insured against claims that create a *potential* for indemnity under the policy." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654.) "'Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. [Citation.] But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered.' [Citation.] This includes all facts, both disputed and undisputed, that the insurer knows or '"becomes aware of"' from any source [citation] 'if not "at the inception of the third party lawsuit," then "at the time of tender"' [citation]. 'Moreover, that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.' [Citation.] Thus, '[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.' [Citation.] In general, doubt as to whether an insurer owes a duty to defend 'must be resolved in favor of the insured.' [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287.)

"While the duty to defend is broad, it is 'not unlimited; it is measured by the nature and kinds of risks covered by the policy.' [Citation.] In an action seeking declaratory relief concerning a duty to defend, 'the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' [Citation.] Thus, an insurer may be excused from a duty to defend only when '"the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."'" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.*, *supra*, 59 Cal.4th at p. 288.)

6

Finally, "[i]n determining whether a claim creates the potential for coverage under an insurance policy, 'we are guided by the principle that interpretation of an insurance policy is a question of law.' [Citation.] 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.]' [Citation.] In determining this intent, '[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' [Citation.] We consider the '"clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage."' [Citation.] We must also 'interpret the language in context, with regard to its intended function in the policy.' [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.*, *supra*, 59 Cal.4th at p. 288.)

B.       *The Employment-Related Practices Exclusion Applies To*
         *The Underlying Claims*

Jon Davler argues that the trial court erred in sustaining Arch's demurrer without leave to amend because the employment-related practices exclusion is ambiguous. Jon Davler contends there is ambiguity in the exclusion's use of the phrases "such as" and "arising out of," and ambiguity created by the presence of "false imprisonment" in the coverage provision and its absence in the exclusion. We see no such ambiguities.

1.       "Such as"

Jon Davler argues that the employment-related practices exclusion "is ambiguous as applied to false imprisonment claims" because the exclusion's use of "the term 'such as' limits the scope of the general exclusionary phrase 'employment-related practices' to sharing [or] having the same or similar characteristics or qualities as 'coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution.'" Jon Davler contends that "[f]alse imprisonment is markedly dissimilar to the specific examples restricting the general exclusionary phrase."

7

The phrase "such as" is "not intended to be exhaustive" (*Harper & Row, Publishers, Inc. v. Nation Enterprises* (1985) 471 U.S. 539, 561 [105 S.Ct. 2218, 85 L.Ed.2d 588]) and is "'illustrative and not limitative'" (*Campbell v. Acuff-Rose Music, Inc.* (1994) 510 U.S. 569, 577 [114 S.Ct. 1164, 127 L.Ed.2d 500]). The use of the phrase "such as" in an exclusion is "nonexclusive" and "'"is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated."'" (*Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest* (2011) 198 Cal.App.4th 781, 788-789, quoting *Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1414; see *U.S. v. Aisenberg* (M.D.Fla. 2003) 247 F.Supp.2d 1272, 1308 ["[i]f nothing else, the phrase 'such as' reveals that other examples exist"], rev'd in part on other grounds in *U.S. v. Aisenberg* (11th Cir. 2004) 358 F.3d 1327.)

False imprisonment shares general similitude with several of the matters specifically enumerated in the employment-related practices exclusion, such as coercion, discipline, and harassment. False imprisonment is the "'unlawful violation of the personal liberty of another,'" where the restraint required "may be effectuated by means of physical force [citation], threat of force . . . [citation], confinement by physical barriers [citation], or by means of any other form of unreasonable duress." (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715; see *Lyons v. Fire Ins. Exchange* (2008) 161 Cal.App.4th 880, 888 ["'[t]he elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief'"].) False imprisonment involves coercion, by force, threat, or otherwise. An employer can commit false imprisonment by assault and battery or by engaging in "some other coercive stratagem." (*Fermino*, *supra*, at p. 722.) Similarly, workplace harassment can include false imprisonment, and employment actions often involve both claims. (See, e.g., *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1410 [supervisor made numerous sexual advances and tried to have sex with employee in garage with the door closed]; *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 839 [supervisor sexually harassed employee and

8

"isolated her from other employees to facilitate his predations"]; *Krause v. Turnberry Country Club* (N.D.Ill. 2008) 571 F.Supp.2d 851, 855 [supervisor sexually harassed employee and, when she announced her departure, "pulled [her] into his office against her will, shut the door, and told her she was committing 'career suicide'"].)[2] Thus, false imprisonment is similar to the examples of employment-related acts listed in the exclusion. Even under Jon Davler's theory, the exclusion applies to false imprisonment claims.

### 2.  "Arising out of"

Jon Davler argues that use of the "the broad term 'arising out of'" creates an ambiguity because it appears both in the coverage clause and in the employment-related practices exclusion. As Jon Davler recognizes, however, courts generally have "interpreted the phrase 'arising out of' very broadly," even where the phrase appears in an exclusion.

"'California courts have consistently given a broad interpretation to the terms "arising out of" or "arising from" in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship.'" (*St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mutual Ins. Co.* (2012) 210 Cal.App.4th 645, 658; see *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.* (2003) 106 Cal.App.4th 293, 301 ["the '"arising out of" connective . . . broadly links' the exclusionary operative events with the exclusion" and is "generally equated" with "'origination, growth or flow from the

---

[2]   Arch does not argue that Insurance Code section 533 precludes coverage for the employees' false imprisonment claims against Jon Davler. (See *State Farm General Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 288 [Insurance Code section 533 "preclude[d] indemnity for the damages awarded for false imprisonment, despite the fact that the . . . policy expressly promised indemnity for false imprisonment"].)

9

event'"]; *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 318-319 [broad interpretation given to terms "'arising out of'" in trademark exclusion in general liability insurance policy]; *Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 503 ["California courts generally have given the terms 'arising out of' or 'arising from' their commonsense meaning, concluding that they connote more than mere causation"].)

The Jon Davler employees' injuries caused by the alleged false imprisonment arose out of the employees' employment. In *Low v. Golden Eagle Ins. Co.* (2002) 104 Cal.App.4th 306, the court held that "factors relevant to [the] determination" of whether the events in the underlying action were within the scope of the employment-related practices exclusion "include (1) the nexus between the allegedly defamatory statement (or other tort) at issue and the third party plaintiff's employment by the insured, and (2) the existence (or nonexistence) of a relationship between the employer and the third party plaintiff *outside* the employment relationship." (*Id.* at p. 314.) Here, the nexus between the "other tort" (i.e., false imprisonment) and the employees' employment with Jon Davler was as close as a nexus can be: the only reason the employees were forced into the bathroom for inspection was that that they were employed by Jon Davler, were following a directive from a supervisor at their place of employment, and would lose their jobs if they did not comply with the inspection demand. And there was nothing in the allegations of the complaint in the underlying action suggesting that there was any relationship between Jon Davler and the employees subject to the inspection other than the employer-employee relationship. Indeed, cases involving strip searches of employees have held that the employment-related practices exclusion applies to bar coverage. (See, e.g., *Cornett Management Co., LLC v. Fireman's Fund Ins. Co.* (4th Cir. 2009) 332 Fed.Appx. 146, 147, 149 [a supervisor's strip search of two female Hooters employees based on a false report that customers had reported a stolen change purse, "which intentionally humiliates, coerces, or harasses an employee, will clearly have an effect on the employment relationship" and "therefore, is employment-related"]; *LDF Food Group, Inc. v. Liberty Mutual Fire Ins. Co.* (2006) 36 Kan.App.2d 853, 855, 862-863

[146 P.3d 1088, 1090, 1095] [managers' strip search of female restaurant employee based on fake law enforcement call that employee might be in possession of contraband was employment-related];[3] see also *Erie Ins. Property & Casualty Co., Inc.* (N.D.W.Va. 2011) 785 F.Supp.2d 561, 564, 568, 573 [owner of preschool who sexually harassed employees and used "his physical strength, to overpower, illegally detain, and restrain" them committed offenses that "undoubtedly arose out of employment-related acts that affected the employment relationship, and therefore [fell] within the broad scope of the [employment-related practices] exclusion"].)[4]

### 3. "False imprisonment"

Jon Davler also argues that there is ambiguity in "the structure of the policy as a whole" because the insuring provision "specifically provides coverage for injury 'arising out of . . . [f]alse arrest, detention or imprisonment,'" and the employment-related practices exclusion "does not specifically exclude false imprisonment." Jon Davler's description of the language of the policy is correct, but its assertion that this language creates an ambiguity is not.

In *Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, the court interpreted a similar employment-related practices exclusion and held that the exclusion applied to a defamation claim by a former employee. (*Id.* at pp. 470-472.) The court

---

**3**     But see *Acuity v. North Cent. Video, LLLP* (D.N.D. 2007) 2007 WL 1356919, p. 16 [strip search of video store employee by manager after manager's accomplice had called the store pretending to be a police officer and accusing the employee of theft did not arise out of an employment-related practice, policy, act or omission].

**4**     Jon Davler does not argue that the employees' alleged false imprisonment does not arise out of employment-related practices, policies, acts or omissions because false imprisonment is not part of the employment bargain. (See *Fermino v. Fedco, Inc.*, *supra*, 7 Cal.4th at p. 723 [for purposes of determining whether false imprisonment claim is barred by workers' compensation exclusivity, "[o]nce it is determined . . . that a false imprisonment has indeed taken place, then such action cannot be said to be a normal aspect of the employment relationship, however legitimate its initial justification"].)

11

held that the employment-related practices exclusion was not ambiguous, even though it was not defined in the policy. "The term [employment-related] is not technical in nature. It is used in its ordinary sense, i.e., related to employment. As a term, it modifies the specified acts (including defamation) as well as the terms 'practices, policies, acts or omissions.' The clear meaning of . . . the exclusion is coverage for practices, policies, acts or omissions which are related to employment, including employment-related defamation." (*Id.* at p. 471; accord, *Low v. Golden Eagle Ins. Co.*, *supra*, 104 Cal.App.4th at p. 310, fn. 3; see *Loyola Marymount University v. Hartford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217, 1222-1223 [exclusion for injury "sustained by any person as a result of an offense directly or indirectly related to the employment or prospective employment" "plainly" and "clearly" applied to former employees' claims for defamation and invasion of privacy].) The *Frank and Freedus* court also held that the exclusionary language was not ambiguous because the provision granting coverage for "personal injury" included defamation. "The fact the policy's general definition of the term 'personal injury' encompasses defamation does not set up a fatal inconsistency or ambiguity because in another section of the policy coverage is excluded for certain personal injuries, including defamation, in a particular context. An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances." (*Frank and Freedus*, *supra*, at p. 471; see *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 759 ["an insurer is not absolutely prohibited from drafting and enforcing policy provisions that provide or leave intact coverage for some, but not all, manifestations of a particular peril"].)

The employment-related practices exclusion in Jon Davler's policy is similarly unambiguous, even though it does not list false imprisonment as one of the examples of an employment-related practice, policy, act or omission. As noted, the employment-related practices exclusion provides a non-exhaustive list of examples of employment-related practices, policies, acts or omissions, so that other practices, policies, acts or omissions may qualify as employment-related. (See *Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest*, *supra*, 198 Cal.App.4th at p. 788 [exclusion for claims arising out of

12

violation of intellectual property rights "'such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity'" applied to right of publicity claim even though "the right of publicity is not specifically listed in the exclusion"].) Thus, the fact that the underlying claim in *Frank and Freedus* (defamation) was listed in the exclusion as an example of "employment-related practices, policies, acts or omissions," and the underlying claim in this case (false imprisonment) is not, does not make the exclusion ambiguous.[5]

Moreover, the policy in *Frank and Freedus* excluded bodily or personal injury "arising out of any" "[c]oercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions . . . ." (*Frank and Freedus v. Allstate In. Co.*, *supra*, 45 Cal.App.4th at p. 470.) The exclusion in Jon Davler's policy with Arch has "employment-related practices, policies, acts or omissions" at the beginning of the exclusion and then lists the examples after "such as," rather than, as the exclusion in *Frank and Freedus*, listing the examples first and concluding with the disjunctive "or other employment-related practices, policies, acts or omissions." The language in the exclusion in Jon Davler's policy makes it even clearer that injuries arising out of all kinds of employment-related practices, including those listed as examples, are subject to the exclusion.

Jon Davler argues that we should follow the federal court's decision in *Zurich Ins. Co. v. Smart & Final, Inc.* (C.D.Cal. 1998) 996 F.Supp. 979, rather than the California court decisions in *Frank and Freedus* and *Low*. In *Zurich* two Smart & Final loss prevention representatives confronted a store employee, drove him without his consent to the Vagabond Motel in Oxnard, California for questioning, locked the door, closed the

---

[5]      In *North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co.* (2006) 137 Cal.App.4th 627 the court declined to address the issue of whether the same version of the employment-related practices exclusion applied to false imprisonment claims made by employees in the underlying action against their employer. (See *id.* at pp. 634, 643, fn. 10.)

13

curtains, deprived him of food and water, questioned him about inventory shortages, and forced him to sign a confession. (*Zurich Ins. Co.*, *supra*, at pp. 981, 983.) The employee filed an action for false imprisonment, fraud, wrongful termination, and intentional infliction of emotional distress. (*Id.* at pp. 982-983.) Smart & Final tendered the complaint to its insurer, which denied the claim based on an employment-related practices exclusion identical to the exclusion in *Frank and Freedus*. (Compare *Zurich Ins. Co.*, *supra*, at pp. 983-984 with *Frank and Freedus v. Allstate Ins. Co.*, *supra*, 45 Cal.App.4th at p. 470.) The *Zurich* court held that "the 'catch-all' phrase 'or other employment-related practices, policies, acts or omissions'" in the employment-related practices exclusion was ambiguous because it did "not plainly and clearly show that the exclusion applies to a false arrest or imprisonment claim." (*Zurich Ins. Co.*, *supra*, at p. 988.) The court noted that the policy, like the policy in this case, specifically provided coverage for false imprisonment but the exclusion did not specifically exclude false imprisonment. (*Ibid.*)

To the extent the court in *Zurich*, a diversity case, attempted to decide issues of California law "as it believe[d] the state's highest court would decide them" (*Zurich Ins. Co. v. Smart & Final, Inc.*, *supra*, 996 F.Supp. at p. 985), we conclude the court's decision in *Zurich* missed the mark. As the Court of Appeal's decisions in *Frank and Freedus* and *Low* reflect, the language of the employment-related practices exclusion is not ambiguous. Moreover, *Zurich* is factually distinguishable because the court in that case found that the false imprisonment claim "arose solely in the context of loss prevention" and "was not clearly employment-related . . . ." (*Zurich Ins. Co.*, *supra*, at p. 988 & fn. 14.) Here, there is and can be no dispute that the false imprisonment of the Jon Davler employees occurred at work in the company restroom, was at the direction of a supervisor, and was employment-related. Finally, as noted, the difference between the language of the exclusion in this case and the language of the exclusion in *Zurich* makes it even clearer that the exclusion applies to all employment-related acts, not just the examples in the exclusion.

14

The conduct giving rise to the false imprisonment claims by the Jon Davler employees are employment-related, and the employees' injuries arose out of their employment. (See *Regional Steel Corp. v. Liberty Surplus Ins. Corp.* (2014) 226 Cal.App.4th 1377, 1394 [even though courts must construe exclusions strictly, courts will give an exclusion """"its literal effect"""" where it """"is clear and unambiguous""""]; *Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 426 ["'[w]here there is no doubt in the meaning of the policy language, courts will not strain to find ambiguities,'" nor "'will the courts construe exclusions strictly against the insurer absent some ambiguity'"]; *Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 146 ["[a]lthough insuring clauses normally are interpreted broadly . . . and exclusions are strictly construed . . . , 'where an exclusion is clear and unambiguous, it is given its literal effect'"].) To be sure, the exclusion could have been drafted to expressly cover an injury arising out of an employment-related act giving rise to false imprisonment by adding false imprisonment to the list of examples, but the fact that the exclusion "could have been written differently does not necessarily mean . . . it is ambiguous . . . ." (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2010) 184 Cal.App.4th 196, 207.) The employment-related practices exclusion barred coverage for the false imprisonment claims.

### C.     *The Employment-Related Practices Exclusion Is Plain and Clear*

Jon Davler argues that even if the employment-related exclusion is not ambiguous, the exclusion is not plain and clear and "understandable to a layperson." According to Jon Davler, the policy "is phrased in an illogical manner" and "[a]n average layperson cannot understand the Policy as excluding coverage for false imprisonment claim unambiguously" because the "extremely broad phrase 'arising out of'" appears "in both the coverage and exclusionary clauses."

"In general, provisions relating to exclusions from coverage must be '"conspicuous"'—'placed and printed so that [they] will attract the reader's attention'—and '"plain and clear"'—"stated precisely and understandably, in words that are part of

15

the working vocabulary of the average layperson.' [Citations.]" (*TIG Ins. Co. of Michigan v. Homestore, Inc.* (2006) 137 Cal.App.4th 749, 759-760, fn. omitted.)[6] "'This means more than the traditional requirement that contract terms be "unambiguous." Precision is not enough. Understandability is also required. To be effective in this context, the exclusion must be couched in words which are part of the working vocabulary of average lay persons.' [Citation.]" (*Universal City Studios Credit Union v. CUMIS Ins. Society, Inc.* (2012) 208 Cal.App.4th 730, 741.)

The employment-related exclusion is sufficiently plain and clear. An average layperson would understand that the exclusion applies a category of claims: those arising in the employment setting. An average person knows what employment is. (See *Horace Mann Ins. Co. v. Analisa N.* (1989) 214 Cal.App.3d 850, 855 [layman reading insurance policy would understand "'in the course of employment'" means the same as "'within the scope of employment'"]; *Ruksznis v. Argonaut Ins. Co.* (D.Me. 2013) 2013 WL 6063379, p. 6 ["[a]n ordinary person would understand the language of the employment-related exclusion to exclude coverage for defamation claims arising out of employment"].) An average person also knows that "such as" means that examples follow. (See *Perez v. Loren Cook Co.* (8th Cir. 2014) 750 F.3d 1006, 1010 ["'[a]n objective reader would interpret the phrase "such as" to mean "for example"'"]; *Lemelson Medical, Educ. & Research Foundation, Ltd. Partnership v. Intel Corp.* (D.Ariz. 2002) 2002 WL 453212, p. 4 ["[t]he phrase 'such as' commonly indicates that what is to follow is an example or further explanation of what has previously been stated"].)[7] Unlike technical legal or medical terms, "employment-related" and "arising out of employment" are not terms or phrases that average persons cannot understand. (See *Brown v. Mid-Century Ins. Co.* (2013) 215 Cal.App.4th 841, 857.)

---

[6] Jon Davler does not argue that the exclusion is not conspicuous.

[7] Contrary to Jon Davler's assertion, the policy does not exclude coverage for all false imprisonment claims, only those false imprisonment claims arising out of employment-related acts and practices. For example, the policy would cover false imprisonment claims by customers, invitees, or other third parties against Jon Davler.

16

D.      *Jon Davler Is Not Entitled to Leave To Amend*

Although Jon Davler did not ask for leave to amend in the trial court, Jon Davler argues on appeal that "the trial court erred in sustaining the demurrer without leave to amend" because Jon Davler pleaded "a reasonable interpretation" of the employment-related practices exclusion and that "the Policy, as a whole, does not exclude coverage for false imprisonment claims."  Other than restating its proposed interpretation of the policy and the exclusion, however, Jon Davler does not say how it would amend its complaint if given leave to do so.  For example, an insurer's duty to defend may arise "'where extrinsic facts known to the insurer suggest that the claim may be covered.'"  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.*, *supra*, 59 Cal.4th at p. 287; see *Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 692 ["duty to defend arises if facts alleged in the complaint, or other facts known to the insurer, *potentially* could give rise to coverage under the policy," and the "facts need only 'raise the possibility' that the insured will be held liable for covered damages"].)  Jon Davler does not argue that it could amend its complaint to allege any such facts.

Similarly, if there were allegations in the complaint in the underlying action or facts known to Arch that raised a possibility that the acts giving rise to the Jon Davler employees' false imprisonment claim were not employment-related, Arch might have a duty to defend.  For example, in *Golden Eagle Ins. Corp. v. Rocky Cola Café, Inc.* (2001) 94 Cal.App.4th 120 the court found that a supervisor's defamatory statement that an employee with whom the supervisor had had a sexual relationship "was a 'sexually promiscuous and calculating bitch' was not made in the context of [the employee's] employment."  (*Id.* at pp. 123, 128-129.)  As the court in *Low v. Golden Eagle Ins. Co.*, *supra*, 104 Cal.App.4th 306 explained, the claim in *Rocky Cola* "arose not out of the plaintiff's employment, but out of a sexual affair with her shift supervisor that had gone sour."  (*Id.* at p. 314.)  In *HS Services, Inc. v. Nationwide Mut. Ins. Co.* (9th Cir. 1997) 109 F.3d 642 the manager of a company made defamatory statements about a former president of the company, who had formed a competing business and was telling third-party vendors that the company was experiencing financial difficulties.  (*Id.* at p. 644.)

17

The court held that the manager's statements were not employment-related because "the purpose of the remarks was to protect [the company] in the marketplace" and to protect the company against comments made by the former president as "a present competitor." (*Id.* at p. 646.) Jon Davler does not state that or how it could amend its complaint to allege facts that the underlying claims were not employment-related. Indeed, it is hard to conceive how the false imprisonment claim of the employees at work in the company bathroom could be unrelated to their employment, and Jon Davler has not suggested how the claim could be.

## DISPOSITION

The judgment is affirmed. Arch is to recover its costs on appeal.

SEGAL, J.*

We concur:

PERLUSS, P. J.

WOODS, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 9/15/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JON DAVLER, INC., | B252830 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC517442 ) |
| v. | |
| ARCH INSURANCE COMPANY, | ORDER MODIFYING OPINION AND CERTIFYING FOR PUBLICATION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 25, 2014, be modified as follows:

1. On page 4, the first sentence under Section C, the word "implied" is added between the words "the" and "covenant" so that the sentence reads as follows:

> John Davler filed this action against Arch for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion.

2. On page 15, (1) at line 2, the second word "are" is changed to "was" and (2) at line 4 of the first full paragraph under Section C, the last word "claim" is changed to "claims."

There is no change in the judgment.

The opinion in the above-entitled matter filed on August 25, 2014, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


_____        _____        _____
PERLUSS, P. J.                WOODS, J.                     SEGAL, J.[*]

---

[*]    **Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.**